JEFFERSON PARK LAND CO., LTD., *v.* PASCOE.

1. CANCELLATION OF INSTRUMENTS—LAND CONTRACTS—FRAUD—PRINCIPAL AND AGENT.

In a suit by the owner of a subdivision against a copartnership acting as its selling agents for the cancellation of certain contracts for the sale of lots on the ground that the price at which the lots were sold to members of the partnership and their relatives and friends was fraudulently fixed by defendants at a price far below the value, the finding of the court below that the proofs failed to sustain said charges, *held*, justified by the record.

2. PRINCIPAL AND AGENT—FRAUD—NOTICE—ACQUIESCENCE—WAIVER.

Where the owner of a subdivision had knowledge that a partnership acting as its selling agent was making sales of lots to its own members and their relatives and friends, and made demand for payment thereon, any fraud in said sales was thereby waived, especially after acquiescing therein for nearly a year and until values had materially advanced.

3. SAME—SALE TO AGENT'S RELATIVES OR FRIENDS NOT FRAUDULENT IN AND OF ITSELF.

There is no rule of law to the effect that it is fraudulent for an agent to enter into a selling agreement for his principal with the agent's acquaintances, friends, or relatives, and, in the absence of specific instances of fraud independent of the sales agreement itself, no fraud existed.

4. PARTNERSHIP—PROOF AS TO EXISTENCE OF RELATIONSHIP.

Proof that certain persons were acting as agents in selling lots in a subdivision, of which a partnership was the selling agent, and that they received as compensation a commission on all sales made by the partnership, is insufficient to establish that they were members of the partnership, especially in view of the fact that they both denied such relationship.

5. CANCELLATION OF INSTRUMENTS—LAND CONTRACTS—FRAUD—PRINCIPAL AND AGENT.

Evidence *held*, to establish that the original selling price fixed on lots in the subdivision was at least the full market value thereof, and that there was no fraudulent underselling by the agent.

On the general rule as to fraud and secret dealings or interest of real estate brokers as affecting their commissions, see annotation in 45 L. R. A. 33.

6. Principal and Agent—Fraud.

It is not fraud on the part of a sales agent to strive to keep his sales good, even though he has to take an assignment and make payments, if there was no fraud in the inception, and no design at the time the original sale was made.

7. Same—Fraud Not Presumed.

That an agent was guilty of fraud in the sale of lots must be shown by proof; it will not be presumed.

8. Contracts—Construction—Performance—Estoppel.

A contract fully performed by one of the parties will not be held invalid for lack of definite terms; the parties, having placed a construction thereon, are bound thereby.

9. Same—Acceptance of Performance After Breach Waives Breach.

A party who knowingly accepts performance after a breach of a contract thereby waives any right to be released by reason of said breach.

10. Accounting—Principal and Agent—Equity.

In a suit by the owner of a subdivision against the selling agent for an accounting, where it appears that the owner desired that payments be made at his office, the agent should not be subjected to a charge because the collections and bookkeeping were thus handled.

11. Cancellation of Instruments—Fraud—Interest.

In a suit for the cancellation of land contracts on the ground of fraud, where fraud was not established, a provision in the decree of the court below suspending accrual of interest on contracts after commencement of suit to the date of final decree, *held*, not justified except as to those vendees who tendered the full amount of the unpaid purchase price.

12. Specific Performance—Vendor and Purchaser—Affirmative Relief Not Justified Where Not Asked For.

Granting the relief of specific performance to vendees who have neither paid nor tendered the whole of the contract price and who have not asked for any affirmative relief, *held*, not justified.

13. Same—Provision in Lieu of Conveyance.

A provision in the decree of the court below that in case vendor refuse to execute and deliver proper conveyance of any lot upon tender of balance due, said amount may be paid to the

county clerk and a certified copy of the decree recorded, *held,* not practical because not sufficiently definite as to various lots and vendees, and the decree is modified by substituting a provision for taking a supplemental decree in the circuit court as to any particular parcel for which payment is made in full, should the vendor refuse to make proper conveyance.

Cross-appeals from Wayne; Houghton (Samuel G.), J., presiding. Submitted January 29, 1929. (Docket No. 79, Calendar No. 34,152.) Decided March 28, 1929.

Bill by the Jefferson Park Land Company, Limited, against Edward B. Pascoe and others, individually, and as copartners as Pascoe & Sons, Matthew Finn, Richard I. Lawson, Charles R. Brown, and others for the cancellation of certain land contracts and for an accounting. From the decree rendered, plaintiff and defendants Finn and Lawson appeal. Modified and affirmed.

*Frank D. Eamon* and *Henry C. Bogle,* for plaintiff.

*Peter P. Boyle, Dan. N. Simonds,* and *Lightner, Oxtoby, Hanley & Crawford,* for defendants.

NORTH, C. J. The bill of complaint herein was filed to secure the cancellation of several land contracts on the ground that they were secured through the fraud of the defendants as vendees and also to secure an accounting. In addition to the answers of the several defendants, four cross-bills were filed which presented questions of accounting and specific performance. By consolidation one suit at law and nine suits for specific performance were added to the issues presented by the pleadings in the original case. The record is somewhat voluminous and numerous briefs have been filed. After having given

the record and briefs careful consideration, we are satisfied that, with the exception of some rather minor modifications which will be noted later herein, the circuit judge who heard the case made a just disposition of the matters involved. He filed an opinion which clearly presents and thoroughly covers the issues in the case. With the modifications noted we accept this opinion and quote therefrom:

"On the 16th day of November, 1920, the Jefferson Park Land Company, Ltd., by Matthew Finn, chairman, entered into an agreement with Pascoe & Sons, by E. B. Pascoe, whereby the said Pascoe & Sons were made exclusive agents for a period of one year to sell certain real estate in the city of Detroit referred to as Wayburn Park subdivision, and certain other property therein.

"The written agreement further provides as follows:

" 'The selling price of said property and terms of agreement to be fixed by first party (Jefferson Park Land Company, Ltd.). Second party (Pascoe & Sons) agrees to use their best endeavors to sell and dispose of said property and to pay for all advertising and other outlays connected with the sale thereof; for all sales made first party agrees to pay the second party, and the second party agrees to accept a commission of six per cent., payable fifty per cent. of all payments made until such commission is satisfied.   *.   *   *

" 'First party agrees in case the services of the second party proves satisfactory, to give second party the sale of the balance of this property when, as and if platted.'

"On November 16, 1921, this contract was renewed by these parties in substantially the same form for a period of one year. On or about January 9, 1923, the former contract was renewed until November, 1923, but said Pascoe & Sons actually

continued selling lots until June, 1924, when their contract relations were terminated.

"October 27, 1924, the Jefferson Park Land Company filed its bill of complaint against Edward B. Pascoe, E. B. Pascoe, Jr., Richard W. Pascoe, William F. Pascoe and Charles K. Brooks, as copartners, doing business under the name of Pascoe & Sons; also joining Matthew Finn and Richard I. Lawson as party defendants, for the purpose of an injunction.

"November 21, 1924, a disclaimer was filed by Wm. F. Pascoe and Charles K. Brooks, to the effect that they were not partners and not interested in the Pascoe & Sons partnership. The other of said defendants filed an answer to said bill of complaint claiming they were the sole partners.

"In its bill of complaint said plaintiff charges the defendant Pascoe & Sons, *first*, with fixing the prices on lots to be sold under said contract, and *second*, with fraudulently and designedly underselling said property, in the following manner: By selling and causing to be conveyed plaintiff's property to members of said Pascoe & Sons association; to relatives of the said Pascoe & Sons, and to other designing individuals, who are alleged to be coconspirators with the said Pascoe & Sons, and that such sales were made at a selling price far below the actual value of said property.

"In their answer defendants deny that they fixed the selling price of said lots, and deny that they were guilty of any fraud in the sale of said lots.

"At or about the same time, or soon thereafter, several persons, grantees of the Jefferson Land Company, in the sale of said lots, filed separate bills intervening in said suit, and asked for a decree of specific performance. On the hearing of said cause another action was joined wherein the defendants E. B. Pascoe & Sons were plaintiffs, and Matthew Finn and Richard I. Lawson, defendants, which last mentioned case involved a claim of the plaintiffs

against the said defendants Finn and Lawson for commissions claimed to have been earned under a former contract for the sale of a piece of property in the city of Detroit commonly referred to as the Finn & Lawson addition.

"On the hearing, with special reference to fixing the selling price of said property, and the terms of payment, notwithstanding the terms of the contract providing that this should be fixed by first party, the testimony disclosed that Matthew Finn, who was the chairman and general manager of the Jefferson Park Land Company, and E. B. Pascoe, who was the acting manager of Pascoe & Sons, had several conferences with reference to fixing the selling price, and the terms of sale; that on two or more occasions Mr. Pascoe submitted and recommended a selling price for the lots in plaintiff's said property. That as a final result of such conferences, a plat of the property having been made, these two gentlemen placed upon said plat the selling price of the respective lots represented thereon. The testimony further disclosed that immediately thereafter defendant Pascoe & Sons began the sale of this property. During the years 1920, 1921, and 1922 but a small portion of said property was sold, and not until about the middle of the year 1923 did the sales of said property become active. During the latter half of the year 1923 and the first half of the year 1924, under the terms and conditions at which this property was offered, the sale thereof became unusually active, to the extent that it was quite apparent that said property could have been sold at a more advantageous price for plaintiffs.

"The testimony also disclosed that before any sale could be consummated the contract was to be signed by said Matthew Finn for the plaintiff, or by some one designated by him so to do. That all sales that were actually made were made in this manner, and the major portion of said contracts were actually signed by Mr. Finn in person.

"The testimony also disclosed that said Matthew Finn was an extensive owner of real estate in the city of Detroit. While this real estate business was not his principal business, yet he had had considerable experience in the purchase, sale, and ownership of valuable real property in Detroit. This knowledge and experience, and his acquiescence at least in establishing the original selling price on these lots, together with the fact that the first two and one-half years after the land was placed on the market comparatively few sales were made, considering the terms of the sale and but few sales having been made, is strong proof that the sale prices when originally fixed were as high as the property would stand. In the few sales that were made during said two and one-half years it is true that lots were sold by Pascoe & Sons to relatives of the Pascoe family and to their friends and associates, which was known by plaintiff in the middle of the year 1923, and acquiesced in by it, as indicated by a letter written by said Matthew Finn, July 6, 1923, to Pascoe & Sons, complaining that payments on certain lots were in arrears. In said letter Mr. Finn stated that the sale agreements were comparatively only a few months old. In the list included in Mr. Finn's letter were the following purchasers: W. F. Pascoe, Donald Pascoe, Kathleen Moncrief, children of said E. B. Pascoe, and known to be such by said Matthew Finn. No complaint was made by him at that time concerning such sales to members of the Pascoe family, and none of these sales were for a lower price than those fixed by Mr. Finn and Mr. Pascoe in 1920. No lots were sold at any time for less than the prices so fixed as aforesaid. On one occasion subsequent thereto (April 15, 1924), at the solicitation of Richard W. Pascoe, Matthew Finn personally signed a contract of sale of one lot to said Richard W. Pascoe.

"Having knowledge that sales of lots to members of the Pascoe family other than the defendants, and demanding payment thereon, in the letter of Mr.

Finn of July 6, 1923, such act on the part of the plaintiff company would clearly constitute a waiver of any fraud in such transaction, if the same was fraudulent, especially after acquiescing therein for nearly one year and until values had materially increased. The same would be true of said sale by Mr. Finn to Richard W. Pascoe. While the law in such cases prohibits a defendant from being both principal and agent, in a transaction of this nature, it must be borne in mind that defendant, as agent of the plaintiff, here never at any time possessed the power to sell and convey the property of the plaintiff, since the only person authorized to convey in this transaction was the plaintiff itself through its chairman, Matthew Finn. We are unable to find a rule laid down by the court of last resort anywhere to the effect that an agent could not enter into a selling agreement for his principal with his acquaintances, friends or relatives; and unless there were a specific instance established by competent proof of fraud, independent of the sales agreement itself, in making sales agreements to such parties, no fraud existed therein. There being no such proof in this case, it is conclusive that such sales were not fraudulently made.

"Concerning the members of the partnership, plaintiff claims that William F. Pascoe and Charles K. Brooks were members of the partnership association of Pascoe & Sons, and offers as proof thereof that for a portion of the time that Pascoe & Sons were under contract with plaintiff that said William F. Pascoe and Charles K. Brooks were acting as sales agents of said property and receiving as compensation for their services a stipulated portion of the commissions on all sales made by Pascoe & Sons. This, of course, is not enough to establish a partnership relation, especially in view of the fact that both William Pascoe and Brooks deny any partnership relation with Pascoe & Sons, who also deny that said

William F. Pascoe and Charles K. Brooks were partners.

"Plaintiff claims a large number of lots were sold by defendants at a fraudulent undervaluation. The major portion of these lots so complained about were sold in the year 1923, many of which were sold before the first day of July of that year. Plaintiff's witness, Hamilton, experienced in subdividing and selling property in the city of Detroit, and experienced in the sale value of lots, testified that during the years 1920, 1921, and 1922, the market for the sale of lots was poor, but commencing with the year 1923 conditions improved and lot values had increased from 10 to 15 per cent. by the first of July, 1923; and that a further increase was experienced between that date and February of 1924. Said Matthew Finn testified that no lots were sold below their market price in 1920, 1921, and 1922.

"On the hearing in 1927 plaintiff's witness, Hamilton, testified as to the value of the lots in question in this suit; and after experiencing phenomenal increase in the value of this property in 1924 and 1925 testified that the increase up to July 1, 1923, was 10 to 15 per cent., which, together with the testimony of Matthew Finn, and the difficulties defendants had in selling these lots prior to that time, is overwhelming evidence that the original selling price fixed on this property was at least the full market value thereof.

"Witness Hamilton also testified that it was not unusual for the selling agents of real estate in Detroit to purchase some of the lots they had under contract for sale.

"Since a large portion of the lots complained of as having been fraudulently undersold were sold at the price listed, plaintiff has entirely failed in proving undervaluation, on any sales prior to July 1, 1923. No lots were sold at any time, even after July 1, 1923, at less than a sales price list prepared by Mr. Finn and Mr. Pascoe. Pascoe & Sons had

experienced serious difficulty for a period of three years in marketing said property, and under such discouraging circumstances for such a period of time it is not at all remarkable that their judgment on the increased values of property during the time they were selling, up to and including the time their contract was canceled in June, 1924, might not be the same as that of the witness Hamilton, who was asked to come into court in 1927, after the phenomenal increases in prices in that locality in 1924 and 1925, and give estimates of the value of the said lots prior to the cancellation of the defendants' contract. The further fact that late in the year 1924, some months after defendants' contract was canceled, and also in the year 1925, that certain of said lots were resold at an advanced price, is not conclusive evidence that the lots were undersold by defendant at the time of such sale, consequently the court finds from all the testimony in this case that there was no fraudulent underselling of lots by defendant. The same is true of the sales referred to in the testimony as having been made to George I. Hanna, Clayton Hahn, and Gringle and Zahm, in some of which it appears that the defendants apparently being desirous of having their sales go through rather than to be canceled or forfeited, in some manner attempted to assist the purchaser by loans or advancement of money, and taking an assignment of their contract as security, which ultimately did, in one or two instances, come into the hands of the defendant. It is not fraud on the part of the agent to strive to keep his sales good, even though he has to take an assignment and make payments, if there is no fraud in the inception, and no design at the time the original sale is made.

"Another matter which was given considerable attention on the hearing and in the briefs is commonly referred to as the Ferry lots. Robert Ferry was an employee of the Detroit city fire department. He claimed to have a few hundred dollars. He had also previously invested in Detroit property by buy-

ing and selling lots. He was an acquaintance of Richard Pascoe and purchased from him some of the lots in controversy. It may be said that an agent, knowing the various circumstances, would not be justified in selling him as many lots as he did, but if Mr. Ferry had some money and a little keener vision than the ordinary person he could see that the future indicated to him a safe investment, and he could purchase on the small terms imposed in these sales a large number of lots, and, like many others before him, would either make or lose his investment. Fortunately his foresight was good, the property increased in value, and he was successful. Plaintiff's contention that Richard Pascoe was fraudulently conniving with Mr. Ferry to purchase lots, and that they jointly reaped the benefits, is based chiefly on the testimony of Mr. Finn as to what he claims Mr. Ferry told him in this regard, all of which statements were denied by Mr. Ferry, and no testimony other than what it is claimed Mr. Ferry had told Mr. Finn and Mr. Smith was produced on the hearing to prove the claim made against Richard Pascoe in this regard. It is true that Mr. Ferry purchased some of the lots in his own name, and in his mother's name; also that he paid the sale price of the lots in accordance with the lease (list) formerly made; that he conveyed some of these lots to other persons at an advantage to himself is not denied, and that he subsequently disposed of several of the lots at a profit, but in all of this there is no fraud shown, unless fraud is to be presumed, which is not the law.    *    *    *

"From the foregoing it is apparent that the plaintiff has failed not only to prove fraud, but failed to prove that he has been injured by any alleged fraudulent act on the part of the defendant, and has failed to prove that he has been consistent with his claim if the same were true, and in consequence thereof plaintiff's bill of complaint and prayer for relief is hereby denied, and an accounting should be had to determine

the amount, if any, now due defendant from plaintiff in connection with their agency contract.

"If necessary, a decree for specific performance may be entered in favor of each petitioner, praying for same."

In addition to the foregoing, provision was made for a decree for an accounting to fix the amount due Pascoe & Sons from Matthew Finn and Richard Lawson, incident to the sales of lots in the Finn Park subdivision. The record justifies ordering such an accounting. The contract incident to which it arises was brief and informal; but it is admitted by Finn and Lawson that all of the lots covered by this contract have been sold by Pascoe & Sons. Since there has been full performance by one of these parties, this contract will not be held invalid for lack of definite terms. The parties by their own conduct have placed a construction on this instrument and they are bound thereby. By accepting performance after the breach of the contract, Finn and Lawson waive any right they may have had to be released because of the failure of Pascoe & Sons to perform according to the exact terms of the contract. It appears from the record that it was the desire of Mr. Finn that payments on the Finn Park subdivision contracts should be paid at his office, and hence Pascoe & Sons should not be subjected to a charge in this accounting because the collections and bookkeeping were thus handled. If other charges have been paid or expenses incurred by Messrs. Finn and Lawson which should have been borne by Pascoe & Sons, they may be considered incident to the accounting.

Unfortunately the decree taken does not conform to the opinion filed in the circuit court. It contains a provision suspending the accrual of interest on

the various contracts after the commencement of suit to the date of final decree. The record does not justify such a provision except as to those vendees who tendered the full amount of the unpaid purchase price as was done in the case of defendants Cools and LePlae. The decree provides specific performance for some of the vendees who have not asked for any affirmative relief and for some who have neither paid nor tendered the whole of the contract price. Granting this relief was not justified. The opinion filed by the circuit judge limited the relief by way of specific performance to those "praying for same." The decree also erroneously provides for an accounting as to "all of the dealings between the Jefferson Park Land Company, Ltd., and Richard I. Lawson, and Matthew Finn." There is also a provision in the decree that in case the vendor—

"shall refuse to execute and deliver any conveyance herein required by it to be executed and delivered, that the person or persons to whom such conveyance should be made may pay the amount or amounts herein provided for to the office of the county clerk for Wayne county; * * * and that thereafter the person or persons to whom such conveyance should be made shall have leave to cause this decree, or a certified copy thereof, to be recorded in the office of the register of deeds," etc.

This is not a practical or sufficiently definite provision in view of the fact that the decree describes numerous parcels of land as to which there are different vendees. The certified copy of the decree would not indicate which party had paid or to which parcel title passed. In lieu of this provision of the decree, provision may be made for taking a supplemental decree in the circuit court as to any particular parcel for which payment is made in full, should the

vendor refuse to make a proper conveyance. It is fairly inferable from the record that these objectionable provisions of the decree were not called to the attention of the trial judge by the appellants when the decree was settled. Some of them were not mentioned in the briefs.

A decree may be taken in this court modifying that of the lower court in the particulars indicated but otherwise the disposition made of the various issues by the circuit judge is affirmed. Costs of this court may be taxed by the appellees against the appellants.

FEAD, FELLOWS, WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred.